US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

OCT 2 7 2016

DOUGLAS F. YOUNG, Clerk
By          Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

CURTIS BOWMAN                                                **PLAINTIFF**

**V.**                          Case No. 16-3116 TLB

PRUDENTIAL INSURANCE
COMPANY OF AMERICA                              **DEFENDANT**

## ORIGINAL COMPLAINT

COMES NOW the Plaintiff, Curtis Bowman, by and through his attorney of record, Bowman & Lewis Law, PLLC, and for his complaint against Prudential Insurance Company of America ("Prudential") states as follows:

### I. Statement of Facts

1.       In 2000, Plaintiff purchased a Long Term Disability (LTD) insurance policy as a member of The American Institute of Certified Public Accountants from Prudential Insurance Company of America. See Prudential Policy attached as **Exhibit 1**.

2.       Mr. Bowman never missed a payment on the policy and never increased the benefits that could be received under the policy. The benefits have always been a maximum of six thousand dollars ($6,000).

3.       In October 2014, Mr. Bowman sought medical care from Dr. Thomas Walden, MD. After an examination, he diagnosed Mr. Bowman with Recurrent Major Depression, Generalized Anxiety Disorder, and Insomnia Disorder. See Affidavit of Thomas E. Walden, M.D. attached as **Exhibit 2**.

1

4.     On January 1, 2015, Mr. Bowman attempted to commit suicide. He was transported by ambulance to Baxter Regional Medical Center where he was admitted and monitored overnight by Dr. Michael Hagaman, M.D.

5.     Mr. Bowman had a scheduled appointment with Dr. Walden on January 2, 2015. While Dr. Hagaman felt that he would benefit from inpatient care, he discharged Mr. Bowman to the care of his sister and friend who were instructed to take him to his psychiatrist appointment.

6.     On January 2, 2015, Dr. Walden advised Mr. Bowman to take some time off from his job, as President of Bowman & Associates, due to the high stress and anxiety associated with being a President of both a law firm and a CPA firm. **Exhibit 2.**

7.     Mr. Bowman took a break from his occupation, but returned to work on January 26, 2015, and continued to work for wage and profit at Bowman & Associates until February 6, 2015. *Id.* See also, Letter from Bowman & Associates attached as **Exhibit 3.**

8.     During the period from January 26, 2015 until February 6, 2015, Mr. Bowman was taking the medications his doctors had prescribed and continued his regular appointments with Doctors Walden and Brown.

9.     On or around February 1, 2015, Dr. Walden determined that despite the efforts from all parties involved to control Mr. Bowman's medical conditions, his mental illness was worsening. **Exhibit 2.**

10.     Mr. Bowman, under the care and with the advice of his doctors, chose to step down from his positions at Bowman & Associates on February 6, 2016 and subsequently caused his law license and CPA license to be put in inactive status.

11.     In early 2015, Mr. Bowman filed a claim for disability benefits because his mental illness left him unable to carry out the material and substantial duties of his occupations as an attorney and accountant. See Attending Physician Statement attached as **Exhibit 4**.

12.     Mr. Bowman provided Prudential all the information and documentation that he was required to provide under the terms of the contract. Prudential requested this information in order to determine if he was disabled according to the definition found in the policy. See **Exhibit 1** at p. 13.

13.     Around the same time, Mr. Bowman's doctors, Dr. Thomas Walden, M.D. and Dr. Phillip Brown, Ph.D., provided Prudential all the information and documentation Prudential requested so it could determine if Mr. Bowman was disabled according to the definition found in the policy. See **Exhibit 4**. See also, Affidavits of Dr. Thomas Walden, MD and Dr. Philip W. Brown, Ph.D. attached as **Exhibit 2** and **Exhibit 5**, respectively.

14.     Prudential determined, after review of the information provided by Mr. Bowman and his treating doctors, that Mr. Bowman's diagnosed anxiety and depression caused a psychiatric impairment that rendered him unable to perform, for wage or profit, the material and substantial duties of his own occupation. See Prudential Letter dated June 4, 2015 attached as **Exhibit 6**; and, Prudential Letter dated

3

June 13, 3015 attached as **Exhibit 7**. The letter from Prudential to Mr. Bowman approving the benefits stated that the maximum duration for his claim is December 31, 2021.[1]

15.     Accordingly, Prudential approved his claim for disability in June of 2015 and his benefits became active in May 2015. *Id.*

16.     Pursuant to the terms of the LTD policy, Mr. Bowman provided proof of his monthly earnings, including tax documents, which Prudential determined entitled him to six thousand dollars ($6,000) per month. *Id.*

17.     Prudential paid Mr. Bowman the benefits to which he was entitled from June 2015 to November 2015 without incident.

18.     On or around November 13, 2015, Sr. Disability Claims Examiner, Maria LaPan, sent a letter to Mr. Bowman notifying him that Prudential was currently reviewing his claim for LTD benefits. In this letter, Prudential requested additional information to assist in its review of his claim. It stated that "to avoid a disruption in benefits," Mr. Bowman must provide the information by **February 11, 2016.** See Prudential Letter dated Nov. 13, 2015 attached as **Exhibit 8**.

19.     Notwithstanding the November letter requesting information by February 11, 2016, Mr. Bowman experienced a "disruption of benefits" when Prudential, unilaterally and without notice, ceased making benefit payments on his claim.

---

[1] In 2015, Prudential increased the maximum duration for certain policy holders, including Mr. Bowman, from age 65 to age 67 for claims made in 2015.

4

20.     Telephone Call Logs that Prudential provided indicate that Mr. Bowman contacted Prudential on or around December 29, 2015 and asked why he had not received a benefit check for the month of December. See Telephone Call Log attached as **Exhibit 9**, pp. 9-10.

21.     These Call Log Messages note that Mr. Bowman (who is identified as "EE" or "ee" in Prudential's Call Logs) asked about not getting a December check and was advised ("adv") that he was approved for LTD only through November 30, 2016 ("11/30"). *Id.*

22.     Mr. Bowman was advised on this call that "additional information is needed to extend clm [sic]" and "the clm [sic] is not closed, PRU [Prudential] just needs additional information to support the clm [sic] medically". *Id.*

23.     On the same phone call, Mr. Bowman informed Prudential that the letter in November (**Exhibit 8**) said additional information was due in February and that it should "therefore not close until after the due date". See **Exhibit 9**. Mr. Bowman informed Prudential that their affirmative action of ceasing his benefit payments without prior notice was unfair and not an action made in good faith. *Id.*

24.     On the same phone call, Prudential "adv[ised] that November has been the approved through date since August…" Mr. Bowman then advised Prudential that he was never notified that the claim was only approved through November. *Id.*

25.     Said phone call was transferred to "ACCNTELE" and Mr. Bowman reiterated his surprise and distress at the fact that his benefits were cutoff arbitrarily

and without notice to him. During this call, it was noted by Prudential's employee that he "started crying and advised he was frightened that his claim would end". *Id.*

26.     On said phone call, Mr. Bowman was advised that his benefits were extended through January 31, 2016 ("1/31/16"). *Id.*

27.     Even after Mr. Bowman directed Prudential to Maria LaPan's letter, his benefits were **not** extended through the deadline that Prudential gave him in the November 15th letter (February 11, 2016). See **Exhibit 8**.

28.     Mr. Bowman was confused as to which date Prudential needed the requested information in order to assist in the review of his claim and to avoid a disruption in benefits. This uncertainty, coupled with the recent arbitrary and willful cessation of benefit payments, caused Mr. Bowman to experience severe anxiety.

29.     Prudential, only about six (6) months earlier, had approved Mr. Bowman's LTD claim because he was diagnosed with Generalized Anxiety Disorder among other medically diagnosed conditions.

30.     Mr. Bowman spoke by phone with Prudential again on January 6th, 7th, 11th, 12th, and 29th; and, February 4th, 9th, 16th, 17th, 18th, 19th, 22nd, 24th, and 25th. *Id.*

31.     As noted in Prudential's Telephone Call Log Messages, Mr. Bowman reiterated, on multiple occasions, that the arbitrary cutoff of his benefits was causing him unnecessary stress and anxiety. The Call Log Messages show that during these calls he was "upset" and "concerned" and "he [did] not understand" and "that the recent events have caused more anxiety and [he] just wants to know what he needs to do." *Id.*

32.     The Call Log Messages from a phone call that took place February 4, 2016 ("02/04/2016") indicate that Mr. Bowman was advised that his "claim is app[roved] thru 01/31/2016". *Id.* at p. 14. To reiterate, Mr. Bowman called Prudential on the 4th day of February 2016 to inquire about the status of his benefits and Prudential advised him that his claim was only approved through the last day of January 2016.

33.     The Messages indicate that Mr. Bowman was not advised that his claim was approved through February 29, 2016 ("02/29/2016") until February 16, 2016. *Id.* at p. 15. There was nothing in the Call Log regarding this short-term extension until then.

34.     Mr. Bowman continued to suffer the uncertainty of the situation and, as a direct result, Mr. Bowman's Anxiety Disorder and other medical conditions were exacerbated. He informed Prudential multiple times about these medical concerns and Prudential noted his distraught demeanor on the phone. Further, he notified Prudential on February 24, 2016 that his doctors increased his prescription and, because of this higher dosage, he was unable to teach that day. *Id.* at p. 18.

35.     According to Prudential's Call Log, it was not until February 25th that Mr. Bowman was advised that his benefits were extended "through 9/30/16". *Id.* at p. 19.

36.     On or about June 29, 2016, Mary Stratton contacted Mr. Bowman by phone. *Id.* at p. 22. During this call, it was noted that she asked Mr. Bowman questions regarding his ability to work and "what is it specific [sic] about reg [sic] occ [sic] that clmt [sic] cant [sic] do?" to which Mr. Bowman answered that "it is too difficult for him to deal with attorneys and tax returns…" and "he advised he gets shivers just thinking

7

about it..." and that "he has a difficult time explaining this but he is not able to do it b/c of the anxiety it causes." *Id.*

37.     On this June 29th phone call, Mary Stratton advised Mr. Bowman that Prudential had "moved DOD back to 12/3/14" and that there was a possible payment issue related this new date. *Id.* This affirmative action of claiming that Mr. Bowman's last day that he worked for wage or profit was not February 6, 2015 (see **Exhibit 2**), as it had already accepted, was a dishonest, malicious action that sought to minimize the payments that Prudential was required to make.

38.     Mr. Bowman worked for wage and profit in 2015. *Id.* Mary Stratton and Prudential alleged that because Mr. Bowman did not receive any earnings in 2015, he was not working for wage or profit. Nowhere in the LTD policy is "wage" or "profit" defined. See **Exhibit 1**. Mr. Bowman informed Mary Stratton and Prudential that he was the managing partner of the firm and was never on salary, that he was on a draw and a guarantee based upon an agreement with his partners. See **Exhibit 9** at p. 23. Prudential ignored and contradicted its own terms and definitions when it claimed that Mr. Bowman did not work for wage or pay in 2015. This further demonstrates a breach of contract and good faith and fair dealing.

39.     The amount of benefits to be paid under the policy is determined by the highest value between the policyholder's average income from the previous two years and the policyholder's income from the previous year. See **Exhibit 1** at p. 14.

40.     Prudential's action of attempting to backdate Mr. Bowman's claim would allow it to use Mr. Bowman's 2012 and 2013 incomes, which were significantly lower than his 2014 income.

41.     If Prudential used Mr. Bowman's 2014 income in calculating his benefits, he would have been entitled to six thousand dollars ($6,000) per month. However, since Prudential attempted to backdate the claim and use his 2012 and 2013 incomes, it could reduce Mr. Bowman's benefit payments to four thousand ($4,000) dollars per month.

42.     Additionally, Prudential increased the maximum age that its policyholders could receive disability benefits from 65 years old to 67 years old for claims made in 2015 or later. See **Exhibit 1** at p. 16.

43.     When Prudential told Mr. Bowman it would backdate his claim to 2014, it made an affirmative action that would potentially save itself from having to pay an extra $2,000/month and an additional two-years' worth of benefits to Mr. Bowman.

44.     In September 2016, Mr. Bowman received a letter from Prudential, specifically from Mary Stratton, Disability Claims Consultant, which stated that his LTD benefits were terminated effective immediately. See attached letter dated September 9, 2016, **Exhibit 10**.

45.     In said letter, Prudential alleged that Mr. Bowman was no longer disabled based upon the findings of a psychiatrist who allegedly reviewed the records Prudential received from Mr. Bowman and Drs. Walden and Brown. *Id.* The letter does not name the psychiatrist who rendered a medical opinion of his mental wellbeing;

however, Mr. Bowman later learned that the psychiatrist employed by Prudential was Dr. Kevin P. Hayes, M.D. of Los Angeles, California.

46.     Prudential's psychiatrist, Dr. Kevin P. Hayes, never contacted Mr. Bowman. Prudential's psychiatrist never attempted to examine Mr. Bowman in person, by phone, or any other manner despite the expressed right to do so under the contract. See **Exhibit 1**.

47.     The September 9th letter referenced three (3) sessions, specifically, the doctors' notes from these sessions, between Mr. Bowman and Drs. Brown and Walden. These visits took place on January 20, 2016, April 21, 2016 with Dr. Walden and on April 5, 2016 with Dr. Brown. Prudential's psychiatrist, Dr. Kevin Hayes, and Prudential's Disability Claims Consultant quoted and paraphrased Mr. Bowman's treating doctors out of context and with willful and malicious disregard of their expressed opinions in order discontinue paying his LTD benefits. See **Exhibits 2 and 5**.

48.     According to the SOAP Note provided by Prudential, Dr. Kevin Hayes reported that Mr. Bowman "seems to describe professional burnout over impairment." See attached SOAP Notes, **Exhibit 11** at p. 34.

49.     Dr. Hayes reported this opinion despite noting that on July 6, 2016, Dr. Walden, MD advised him that "his prior opinion is unchanged." ***Id.***

50.     Dr. Kevin Hayes's opinion directly contradicts the opinions of Mr. Bowman's treating physicians, Drs. Walden and Brown. Mr. Bowman's treating physicians informed Dr. Hayes and Prudential that nothing had changed with respect to his ability to work as an attorney and/or accountant, and that their opinions had not

changed since Mr. Bowman's claim was approved in 2015. See Letter from Dr. Walden, dated December 15, 2015 attached as **Exhibit 12**; Letter from Terri Itzid at Mountain Home Psychiatric Medicine dated March 4, 2016 attached as **Exhibit 13**; and, Letters from Drs. Thomas Walden and Philip Brown, both dated July 6, 2016, attached as **Exhibits 14 and 15**, respectively. See also Affidavits of Drs. Walden and Brown attached as **Exhibits 2 and 5**, respectively. Prudential has not stated why it chose to use the opinion of a psychiatrist who has never even spoken to Mr. Bowman as opposed to the opinions of Mr. Bowman's treating doctors.

51. Dr. Hayes, after allegedly reviewing all the documentation and information in Prudential's file regarding Mr. Bowman, decided that a direct, personal examination of Mr. Bowman was not needed to render a medical opinion. Dr. Hayes and Prudential made this affirmative decision to deny the claim without such an examination despite the fact that the contract provided that option and despite the fact that Mountain Home Psychiatric Medicine advised "it would be best for you to get your own evaluation done with someone who will contract with your company." **Exhibit 13**.

52. Dr. Hayes alleged that his "opinions expressed... are true to a reasonable degree of medical certainty." See **Exhibit 11** at p. 34.

53. Mr. Bowman's treating doctors stated that, "in their professional opinions, it is unethical and irresponsible for a psychiatrist to render an opinion and draw conclusions about possible psychiatric impairments of an individual... without personally examining said individual." See **Exhibit 2** at Paragraph 10 and **Exhibit 5** at Paragraph 7.

54.     Accordingly, Dr. Kevin P. Hayes opinion was rendered unethically and in bad faith. Dr. Hayes's determination was malicious, dishonest, and against reasonable medical methods and practices and was provided with the intention of avoiding liability for Prudential under the LTD policy.

55.     Prudential, by relying upon Dr. Hayes's bad faith opinion, acted with malice, deceit, and ill will when it terminated Mr. Bowman's LTD benefits. Moreover, it cannot claim a good faith defense because it is unreasonable, irresponsible, and a breach of good faith and fair dealing to rely upon a medical opinion that was based upon three (3) notes from Mr. Bowman's doctors, was provided without ever physically examining or even speaking to Mr. Bowman, and was rendered with the knowledge that his treating doctors held diametrically opposing opinions regarding his mental state.

56.     On September 23, 2016, a letter demanding reinstatement of Mr. Bowman's benefits was sent to Prudential's Disability Claim Consultant, Mary Stratton. See **Exhibit 16**.

57.     On September 26, 2016, Prudential provided a letter via facsimile denying the demand for reinstatement. See **Exhibit 17**.

58.     On October 3, 2016, a letter of appeal was sent via to Prudential. It is Prudential's stated policy to review appeals and provide a response within forty-five (45) days of receipt of an appeal. See Letter of Appeal attached as **Exhibit 18**.

59.     Mr. Bowman is filing a Temporary Restraining Order and a Motion for Preliminary and Permanent Injunction concurrently with this Original Complaint.

## II. Jurisdiction and Venue

60.     Plaintiff incorporates and re-alleges the foregoing paragraphs 1- 59 into this section of the Original Complaint.

61.     Mr. Bowman resides in Mountain Home, Arkansas. At the time that the breach of contract and bad faith occurred, he lived in Mountain Home, Arkansas. Accordingly, this court has personal jurisdiction over Mr. Bowman and Prudential.

62.     This action alleges violations of state and federal law. Furthermore, the amount that Plaintiff is seeking exceeds $75,000 and Prudential is a company based out of Pennsylvania, so there is diversity jurisdiction pursuant to 28 USC 1332.

### III. Breach of Contract

63.     Plaintiff incorporates and re-alleges the forgoing paragraphs 1-62 into this section of his Original Complaint.

64.     A breach of contract occurs when: (a) there is the existence of an enforceable contract; (b) the plaintiff has satisfied his or her obligations under the contract; (c) the defendant violated his or her obligation(s) under the contract; and (d) the defendant's violations caused the plaintiff to suffer damages. *Rablais v. Barnett,* 683 S.W.2d 919, 284 Ark. 527 (Ark. 1985).

65.     To create an existing contract, there must be (a) an offer; (b) an acceptance; and (c) consideration. *Housley v. Hensley,* 265 S.W.3d 136, 100 Ark. App. 118 (Ark. App. 2007).

66.     Prudential offered Mr. Bowman a Long-term disability policy, through its agent, The American Institute of Certified Public Accountants, and Mr. Bowman accepted that offer by agreeing to the policy on July 1, 2000.

13

67.    The consideration of the resulting contract between Prudential and Mr. Bowman was that Mr. Bowman would pay his premium amounts each year and Prudential would insure Mr. Bowman if Mr. Bowman ever became disabled.

68.    Mr. Bowman performed his contractual obligations when he made prompt and timely payments on his premiums each year and by complying with all contractual duties, such as requests for information regarding his proof of disability.

69.    Mr. Bowman is a member of Class 1 per the contract. See **Exhibit 1**.

70.    Mr. Bowman provided proof of his disability in or around March 2015.

71.    The LTD Policy Provisions section "How Does Prudential Define Disability?" states that a policyholder is disabled when, due to a sickness or injury, the person is "unable to perform, for wage or profit, the material and substantial duties of [their] own occupation; are under the regular care of a doctor; and are not working at any job for wage or profit." See **Exhibit 1**, p. 13.

72.    Prudential defines a sickness as "any disorder of your body or mind, but not an injury". It defines mental illness as "a psychiatric or psychological condition regardless of cause," and then lists depression and anxiety among other conditions and states that they "are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine. See ***Id.***, Glossary.

73.    Prudential assesses a policyholder's ability to work by facts and opinions from the claimant's doctors and doctors, other medical practitioners or vocational experts of its choice. Further, a policyholder can be subject to examinations by doctors,

practitioners, or experts of its choice. This provision grants Prudential the right to require these examinations as often as it is reasonable to do so. *Id*. However, Prudential never made any attempt to examine Mr. Bowman.

74.    Mr. Bowman suffers from acute anxiety and depression that can quickly become exacerbated by high stress environments. Mr. Bowman's own occupation, which Prudential defined as the occupation one is routinely performing when the disability occurs, was that of an attorney, accountant, and President of Bowman & Associates. See **Exhibit 1**, Glossary.

75.    Mr. Bowman and his treating doctors advised Prudential that the disabling conditions that precluded his ability to perform the duties of his own occupation have not changed since Prudential approved his claim.

76.    Mr. Bowman's disabling conditions have not vanished since he was diagnosed and approved by Prudential for disability benefits. On the contrary, he continues to seek regular care from his doctors and he takes prescribed medications to manage these disabling conditions.

77.    Prudential's psychiatrist, Dr. Hayes, stated that a review of the records from Mr. Bowman's doctors revealed that he is psychiatrically stable and, therefore, able to perform the material and substantial duties of his own occupation. However, this ignores the fact that Mr. Bowman still suffers from the same mental illnesses that he did at the time Prudential approved it. Dr. Hayes and Prudential also ignore the fact that his treating doctors remain of the opinion that working as an attorney and/or accountant is not a possibility in his condition.

78.     Assuming, *arguendo*, that Mr. Bowman has been psychiatrically stable since April 2016, the fact remains that he continues to seek regular care and treatment for the mental illnesses from which he suffers; and the high stress, fast pace, difficult and complex tasks, and the weight of responsibilities that are inherent in the material and substantial duties of his own occupations are not within his ability, just as they were not when the claim was approved.

79.     Mr. Bowman's doctors have confirmed that it is inadvisable for him to continue working at his own occupation. As his doctors previously advised Prudential, any attempt to work at his own occupations, as an attorney/accountant, at this time would bring about an increase in stress, which would negatively affect his medical condition, and could cause serious problems for his overall health and wellbeing.

80.     Mr. Bowman performed his contractual obligations by providing the requested information and documentation Prudential requested when determining his eligibility for LTD benefits.

81.     Prudential defines "regular care" as personally visiting a doctor as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat one's disabling condition(s); and receiving the most appropriate treatment and care for one's disabling condition(s) by a doctor whose specialty or experience is the most appropriate according to generally accepted medical standards. See **Exhibit 1**, p. 27.

82.     Mr. Bowman personally visits his psychiatrist, Dr. Walden, MD, and his psychologist, Dr. Brown, Ph.D., as frequently as they determine is medically required.

The treatment and care he receives is the most appropriate for his disabling conditions and his doctors' specialty and experience is the most appropriate for said conditions.

83.    Mr. Bowman is eligible for coverage and meets the requirements for disability benefits.

84.    Because Mr. Bowman is still eligible for coverage, and the monetary benefits that accompany that coverage, Prudential violated its obligations under the contract by terminating the benefits of an eligible policyholder.

85.    Because Prudential violated its contractual obligations under the contract/policy, Mr. Bowman has suffered damages in the form of extreme stress, anxiety, and depression, as well as financial damages from Prudential's failure to pay the benefits he is entitled to under the contract.

### III. Tort of Bad Faith

86.    Plaintiff incorporates and re-alleges the forgoing paragraphs 1-85 into this section of his Original Complaint.

87.    Arkansas recognizes the tort of bad faith for both first-party and third-party insurance policies and claims. *Selmon v. Metropolitan Life Ins. Co.*, 277 S.W.3d 196, 372 Ark. 420 (Ark. 2008).

88.    An insurance company commits the tort of bad faith when it "affirmatively engages in dishonest, malicious, or oppressive conduct in order to avoid a just obligation to its insured." *Unum Life Ins. Co. of America v. Edwards,* 210 S.W.3d 84, 362 Ark. 624 (Ark. 2005).

89.     Prudential affirmatively acted in bad faith when it unilaterally terminated Mr. Bowman's LTD benefits without notice on November 30, 2015, despite telling him just two weeks prior that extra information was needed by February 2016. Prudential knowingly and willfully contradicted its previous assurances and it acted dishonestly in an attempt to avoid liability.

90.     Prudential then placed Mr. Bowman on temporary, short-term extensions that also contradicted the deadline provided in the letter dated November 13th.

91.     Prudential knew about Mr. Bowman's stress, anxiety and depression, and Prudential knew that stringing Mr. Bowman along each month only exacerbated his stress, anxiety and depression.

92.     Only after approximately three (3) months of severe stress and repeated phone calls by Mr. Bowman did Prudential agree to reinstate his benefits. But only until September 30, 2016.

93.     Mr. Bowman, having already experienced the nightmare associated with Prudential's arbitrary termination of benefits and the uncertain, dishonest nature of its month-to-month extensions, was unsure if Prudential would honor this reinstatement.

94.     Before September 30, 2016, the date that he was assured his benefits were approved through, Prudential maliciously and dishonestly terminated his LTD benefits. To reiterate, Prudential assured Mr. Bowman that his benefits would be paid through at least September 30, 2016, and yet, with a willful disregard for its obligations and promises, Prudential terminated Mr. Bowman's benefits on September 9, 2016. See **Exhibit 9** at 19.

18

95.     Prudential cannot claim it acted in good faith by relying on its psychiatrist since Dr. Kevin Hayes acted in bad faith when he rendered his opinion of Mr. Bowman's mental condition and his ability to work. Dr. Hayes's dishonest and oppressive opinion was provided with the intention of alleviating Prudential from their liability under the contract. It was not provided ethically and was not accurate to a reasonable degree of medical certainty. As such, Prudential should be held accountable for permitting and possibly encouraging this type of malicious medical practice.

96.     Prudential exhibited further bad faith when it attempted to backdate the date the claim was made and when Mr. Bowman stopped working for wage and profit. This attempt to backdate was made by Prudential while knowing that Mr. Bowman worked for wage and profit in 2015 (see **Exhibit 3**) and knowing that such a claim could save Prudential money.

97.     Mr. Bowman suffered severe emotional and mental distress directly caused by these dishonest, malicious actions that Prudential willfully and knowingly undertook. Moreover, the aforementioned affirmative misconduct was deceptive and oppressive and designed to frustrate the policyholder and circumvent its liability under the contractual obligations of the policy. As such, Prudential has acted in bad faith.

### IV. Request for Jury Trial

98.     Plaintiff incorporates and re-alleges the forgoing paragraphs 1-97 into this section of his Original Complaint.

99.     Mr. Bowman respectfully requests a jury trial in this matter.

### V. Conclusion

100.   Plaintiff incorporates and re-alleges the forgoing paragraphs 1-99 into this section of his Original Complaint.

101.   Prudential exhibited a pattern of disrespect and disregard that is reprehensible and that, consequently, breached its contract and its duty of good faith and fair dealing. Mr. Bowman deserves every remedy available under the law, and he is therefore seeking compensatory damages for his emotional and mental pain and suffering as well as damages for lost benefit payments under the terms of the contract. Further, Mr. Bowman is seeking both statutory and common law punitive damages in order to ensure that Prudential does not continue to exhibit similar actions towards him and its other policyholders. In addition, Mr. Bowman seeks all costs incurred in this matter and attorneys' fees.

WHEREFORE, Mr. Bowman prays that this court find that Prudential breached its contract and violated its duty of good faith and fair dealing and award Plaintiff damages that a jury deems just and proper and for attorney's fees and all other relief to which he is entitled.

Respectfully submitted,

BOWMAN & LEWIS, PLLC

Nathan Lewis (2006231)
109 S. Spring St.
Suite 14
Springdale, AR 72764
Phone: (501) 251-1701
Fax: (501) 377-9238
nathan@lrattorney.com