IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**CURTIS BOWMAN**                                                                 **PLAINTIFF**

v.                                    Case No. 3:16-CV-03116

**PRUDENTIAL INSURANCE
COMPANY OF AMERICA**                                                              **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Now before the Court are Plaintiff Curtis Bowman's Motion for Leave to Amend Original Complaint (Doc. 36) and Brief in Support (Doc. 37); a Response in Opposition (Doc. 38), filed by Defendant Prudential Insurance Company of America ("Prudential"); and a Reply (Doc. 39), filed by Mr. Bowman. For the reasons explained herein, the Motion for Leave to Amend is **DENIED** as futile, and the case will be dismissed with prejudice.

### I. BACKGROUND

Mr. Bowman is a highly educated professional. He holds a law degree and is a certified public accountant ("CPA"). In the year 2000, he purchased a long-term disability insurance policy offered through The American Institute of Certified Public Accountants. The policy, serviced by Prudential, offered a maximum benefit of $6,000 per month. Mr. Bowman asserts that he never missed a payment on the policy.

At some point, Mr. Bowman became President of Bowman & Associates, which is a CPA firm located in Mountain Home, Arkansas. According to the Complaint (Doc. 1), he became depressed sometime in October of 2014 and sought medical care from Dr. Thomas Walden. He was diagnosed with depression, generalized anxiety disorder, and insomnia disorder. Then on January 1, 2015, Mr. Bowman attempted to commit suicide

1

by intentionally overdosing on Effexor, an antidepressant. He was transported by ambulance to Baxter County Regional Medical Center, where he was monitored overnight and released the following day. On January 2, 2015, Mr. Bowman took some time off from his job running his CPA firm, on his doctor's advice, and sought therapy and medical care for his depression. He returned to work on January 26, 2015, all the while taking various medications that his doctors had prescribed, and continuing to attend regular appointments with his doctors. On or about February 1, 2015, however, he and his doctors determined that his mental health was not improving, and, as of February 6, 2015, he stepped down from his position at the head of the CPA firm that bore his name. Mr. Bowman then placed both his law and CPA licenses in inactive status.

In March of 2015, Mr. Bowman filed a claim for disability benefits under the long-term disability policy serviced by Prudential, and he provided the company with proof of his mental illness. Based on the information supplied by his treating doctors, Prudential approved his request for benefits on June 4, 2015, and began paying him $4,000 per month. *See* Doc. 1-6. In a letter dated June 12, 2015, Prudential informed Mr. Bowman that his benefits were being raised to the maximum of $6,000 per month. *See* Doc. 1-7.

Several months passed, and on November 13, 2015, Prudential notified Mr. Bowman in a letter that it was currently reviewing his claim for benefits. It asked him to: (1) provide a completed form entitled "Activities of Daily Living Request"; (2) call Prudential's office to provide a current update on his medical condition; (3) ensure that his treating providers, Drs. Walden and Brown, supplied Prudential with copies of his medical records from October 1, 2015, through the present; and (4) complete a "Capacity Questionnaire." (Doc. 1-8, p. 1). Even though the letter asked Mr. Bowman to provide all

2

this information by February 11, 2016, Mr. Bowman asserts that his benefits were cut off without explanation in late December of 2015. What he neglects to mention in the body of his Complaint is that his treating psychiatrist, Dr. Walden, sent a letter to Prudential on December 15, 2015—which is attached to the Complaint—that stated that "nothing has changed" with regard to Mr. Bowman's status, and that he declined to provide further information at this time, as "disability evaluation and continuous updating of disability status is not within the scope of services rendered at our clinic." (Doc. 1-12).

Shortly after this time, Mr. Bowman began calling Prudential multiple times a week to ask why his benefits were being terminated. He did so from about December 29, 2015, through January 25, 2016. At some point during this time, his benefits were reinstated. Call logs attached to the Complaint (Doc. 1-9, p. 14) indicate that certain medical records from Drs. Walden and Brown were faxed to Prudential on February 4, 2016. On or about February 16, 2016, a Prudential representative told Mr. Bowman by phone that his disability claim was under review, but that his benefits would be extended through February 29, 2016. *Id.* at 15. This "end date" for receiving benefits was revised again on February 25, 2016, when a Prudential agent informed Mr. Bowman that the review of his claim was ongoing, but that he would be paid benefits through September 30, 2016. *Id.* at 19. Mr. Bowman asserts that the constant uncertainty surrounding the review of his disability claim caused him to experience severe anxiety.

On or about June 29, 2016, an adjuster working for Prudential named Mary Stratton contacted Mr. Bowman and asked him several questions regarding his medical condition and the last day that he worked at his CPA firm for wage or profit. It appears there arose a dispute between Prudential and Mr. Bowman at that time as to whether Prudential had

appropriately logged Mr. Bowman's last day of work as having occurred in early 2015, rather than in late 2014. This dispute was important because the amount of benefits owed under the policy was calculated by considering the policyholder's average income for the years prior to the last day of work. If, for example, an insured's last day of work was in 2015, rather than 2014, the insured's calculation of benefits would be different, and also, the insured would be permitted to take advantage of a policy change implemented by Prudential for claims made in 2015, which effectively increased the total number of years that an insured could receive benefits.

Ms. Stratton also asked Mr. Bowman, during that same phone call on June 29, what it was, specifically, about being a lawyer and accountant that he could no longer perform—since he admitted that he was perfectly able to work as an adjunct professor, teaching law at the local college. Mr. Bowman responded to Ms. Stratton that it was "too difficult to deal with attorneys and tax returns," and that he "gets shivers just thinking about it." *Id.* at 22. He explained that "teaching is a lot different . . . more low key with less anxiety and [is] enjoyable for him and fulfilling." *Id.*

On September 9, 2016, Ms. Stratton penned a follow-up letter to Mr. Bowman, in which she advised him that the internal review of his medical file had been completed, and Prudential had decided to terminate his long-term disability benefits. The letter stated:

> As noted above, based on the internal psychiatrist's review of the updated medical records on file, you have been psychiatrically stable since April of 2016. The current medical records do not support any psychiatric impairment that would preclude you from performing the material and substantial duties of your own occupation.

(Doc. 1-10, p. 3).

Prudential's reviewing psychiatrist was Dr. Kevin Hayes. He reviewed the medical

4

reports provided by Mr. Bowman's treating physicians and noted that although Mr. Bowman continued to receive follow-up monitoring and take medications for both anxiety and depression, his condition had remained stable since his suicide attempt, and he had not relapsed. Dr. Hayes observed that since the suicide attempt, Mr. Bowman had maintained a seemingly healthy lifestyle and had found part-time work that he found enjoyable, teaching classes about ten hours per week at the local college. *See* Doc. 1-11, p. 31. Dr. Hayes also determined that Mr. Bowman: (1) was maintaining basic psychiatric stability by continuing with his regular medication, (2) had denied any depressive symptoms or excessive anxiety since his suicide attempt, (3) reported stable sleeping habits to his doctors, (4) only saw his doctors every three or four months, (5) served on the board of the chamber of commerce along with teaching college classes every semester, (6) had reported to his therapist, Dr. Brown, that he was enjoying life and planning two excursions, and (7) had reported to his psychiatrist, Dr. Walden, that the only anxiety-producing event he had experienced lately was when Prudential cut off his disability benefits for a brief period of time in December of 2015. *Id.* at 32-33.

In reviewing the medical file, Dr. Hayes surmised that Mr. Bowman was suffering from "professional burnout," rather than a continuing, debilitating psychiatric condition. *Id.* at 34. In addition, Dr. Hayes noted that he had attempted to contact Drs. Walden and Brown at their shared office to discuss Mr. Bowman's case, but was told by a receptionist/office manager that they "would not speak to [Dr. Hayes] re any disability-related issue." *Id.*; Doc. 1-9, p. 23. Instead, Drs. Walden and Brown supplied Prudential with their clinical notes from their visits with Mr. Bowman over the last few months, and with identical, rather cursory, one-sentence letters addressed to Ms. Stratton, that each read:

"My opinion regarding Mr. Bowman's disability status has not changed since our last communication." (Docs. 1-14, 1-15).

On September 23, 2016, Mr. Bowman's attorney sent a letter to Ms. Stratton, demanding reinstatement of Mr. Bowman's benefits. On September 26, 2016, Prudential denied the demand in writing. Then, on October 3, 2016, Mr. Bowman sent a letter of appeal to Prudential. Mr. Bowman admits that it is Prudential's stated policy to review any appeal within 45 days; however, Mr. Bowman filed suit in this Court on October 27, 2016, only 24 days after filing his appeal, and before a decision on the appeal had been made. Mr. Bowman also filed a Motion for Temporary Restraining Order or Preliminary Injunction (Doc. 6) in this Court shortly after filing the Complaint, in an effort to force Prudential to immediately resume making benefit payments to Mr. Bowman while the merits of the case were still being decided. The Court denied the request for an *ex parte* temporary restraining order, but held in abeyance the request for preliminary injunction until the matter was fully briefed by the parties. *See* Doc. 9.

On December 27, 2016, the parties submitted to the Court their Joint Rule 26(f) Report (Doc. 20). Then, on January 3, 2017, Mr. Bowman filed a Motion to Withdraw the Motion for Permanent Injunction (Doc. 21), advising the Court that Prudential had agreed to pay Mr. Bowman's disability benefits retroactively from the date his claim was denied in September of 2016, and going forward into the future. The Court granted the Motion to Withdraw and held a Case Management Hearing on January 4, 2017, primarily to check in with the parties and verify that the pending claims had now been resolved. This was not the case, however. During the hearing, Mr. Bowman's counsel, Mr. Kyle Mayton, informed the Court that he believed he still could make out a breach of contract claim even though

"there wouldn't be any" claim for compensatory damages. He also stated that he believed the facts set forth in the original Complaint stated a claim for bad faith in the insurance context.

Counsel for Prudential, Mr. Ian Morrison, responded that the breach of contract claim was clearly moot because his client had agreed to pay all benefits that had been withheld from Mr. Bowman, and would continue to pay benefits going forward, as long as Mr. Bowman remained eligible. Mr. Morrison also confirmed that the parties had come to an agreement that Mr. Bowman's last day of work was in 2015, not 2014, and that payments would be adjusted according to that mutual agreement. As for the claim of bad faith, Mr. Morrison argued that no facts suggested Prudential had affirmatively engaged in conduct that showed a spirit of hatred, malice, or ill will—which is the standard required to prove bad faith under Arkansas law.

After hearing from both parties on these issues, the Court advised Mr. Mayton to proceed as follows:

> Mr. Mayton, let me go back to you. What my thought is, is in light of the events that have transpired since you filed the lawsuit and your own assessment that there might not be much left of the breach of contract claim, if anything, it seems to me that one thing that the Court could do is ask that you file an amended complaint by a date certain that will kind of reset the table so that both Prudential and the Court will understand more precisely what the current allegations are and so that dispositive motion practice, if any is warranted, could be pursued. It would also give you an opportunity to further research the bad faith law and make any factual allegations that you believe exist to support that claim.

The Court then set a deadline of February 3, 2017, for Mr. Bowman to file an amended complaint.

This deadline came and went. About a month later, on March 2, 2017, Prudential moved to dismiss the case for lack of prosecution, explaining that Mr. Bowman had not

filed an amended complaint, and, furthermore, all of his claims were either moot or implausible. *See* Docs. 26, 27. It appears that Prudential's Motion to Dismiss caught Mr. Mayton's attention, and he immediately filed an Amended Complaint (Doc. 28) on Mr. Bowman's behalf that same day, March 2, 2017, without first seeking leave of Court to do so. Prudential then filed a Motion to Strike the Amended Complaint (Doc. 29) and Brief in Support (Doc. 30), arguing that the Amended Complaint was improperly filed out of time, and without leave of Court. Mr. Bowman filed a Response to the Motion to Strike (Doc. 33) and a Brief in Support (Doc. 34), in which he explained that he "inadvertently failed to comply with [the Court's] order [to file an amended complaint by February 3, 2017], and when he realized the error he filed his Amended Complaint as soon as possible and did so in a good faith attempt to remedy this error." (Doc. 34, p. 2).

On March 28, 2017, the Court issued a text-only Order granting Prudential's Motion to Strike, striking the Amended Complaint (Doc. 29), and directing Mr. Bowman to file an appropriate motion for leave to file an amended complaint no later than April 4, 2017. Mr. Bowman complied with the Court's Order and filed his Motion for Leave (Doc. 36), a Brief in Support (Doc. 37), and a proposed amended complaint (Doc. 36-1), along with attached exhibits (Docs. 36-2 to 36-21). In the Brief in Support, Mr. Bowman explains that his proposed amended complaint alleges the same facts and causes of action as those asserted in the original Complaint, but also includes new, updated facts that came to light after the lawsuit was filed—primarily the facts surrounding Prudential's review of Mr. Bowman's administrative appeal and its decision to reinstate his benefits. (Doc. 37, pp. 2-3). The Court has reviewed the proposed amended complaint and concurs that it is completely identical to the original Complaint, except with the addition of the facts in

8

paragraphs 59-68, which are referenced periodically in the substantive claims later on in the pleading. The facts in paragraphs 59-68 describe what happened in the case from the time the original Complaint was filed, until the time Prudential completed its internal appellate review and decided to reinstate Mr. Bowman's benefits and reimburse him for any unpaid benefits previously withheld. The claims for breach of contract and bad faith remain, as does Mr. Bowman's prayer for "damages for lost benefit payments under the terms of the contract," (Doc. 36-1, p. 24)—even though he concedes elsewhere in the same pleading that he was fully reimbursed for all lost benefit payments, *see id.* at 15.

Prudential filed a Response in Opposition (Doc. 38) to Mr. Bowman's Motion for Leave. In the Response, Prudential argues that the Court should deny Mr. Bowman leave to amend because his proposed amended complaint asserts claims that are futile, particularly in light of Prudential's favorable review of Mr. Bowman's administrative appeal and its decision to reinstate benefits. Prudential contends that Mr. Bowman cannot state a claim for breach of contract because he admits he is not owed any compensatory damages, and his request for consequential or special damages is not cognizable as a matter of law, as special damages were not previously agreed upon by the parties in their contract and are not ordinarily awarded under Arkansas law unless compensatory damages are also awarded. As for the claim of bad faith, Prudential continues to argue, as it did in response to the original Complaint, that the facts set forth in the Complaint—even if assumed true—cannot state a cause of action for bad faith as a matter of law.

Mr. Bowman's Reply (Doc. 39) restates his argument that Prudential's original decision to terminate benefits breached the parties' contract, and that the cessation of

9

benefits for an approximately four-month period caused him to suffer consequential damages in the form of damage to his credit score, a depreciation of his status within the community, the loss of trust and goodwill from those to whom he owed money but was unable to pay, and the exacerbation of his symptoms of anxiety and depression. He also contends that he suffered damage in the form of an increased monthly mortgage payment, which was imposed by his lender when he failed to pay his mortgage during the period that his benefits were terminated. To be clear, Mr. Bowman does not contend that he is currently owed benefits under the insurance contract.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 15(a)(2), the Court "should freely give leave" to amend a pleading "when justice so requires." However, when there is "good reason for denial, 'such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment,'" it is within the Court's discretion to deny leave to amend. *Becker v. Univ. of Neb. at Omaha*, 191 F.3d 904, 907–08 (8th Cir. 1999) (quoting *Brown v. Wallace*, 957 F.2d 564, 566 (8th Cir. 1992)). An amendment is considered futile if it would not survive a subsequent motion to dismiss. *See Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 511 (8th Cir. 2012).

To survive a motion to dismiss, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must accept all of a complaint's factual allegations as true, and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

However, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. DISCUSSION

After careful review of the original Complaint and the proposed amended complaint, the Court finds that allowing leave to amend would be futile, as the claims set forth in the proposed amended complaint would not survive a subsequent motion to dismiss. As a preliminary matter, the Court observes that Mr. Bowman violated Court rules in filing an Amended Complaint (Doc. 29) on March 2, 2017, approximately a month after the deadline imposed by the Court, and without first seeking leave to file out of time. Further, the Amended Complaint was only filed after Prudential filed a Motion to Dismiss for failure to prosecute. The Court struck the Amended Complaint and permitted Mr. Bowman to file a Motion for Leave to File, which he did, and which Prudential now opposes. Frankly, the fact that Mr. Bowman persists in litigating this case is puzzling to the Court, as his claims are either moot at this point, or devoid of merit.

To recap briefly, Mr. Bowman filed this lawsuit 24 days after he filed an

11

administrative appeal of Prudential's decision to terminate his long-term disability benefits. The language of the insurance contract at issue is not abundantly clear with respect to a policyholder's right to file suit while a first appeal is pending. Under the heading, "What Are the Time Limits for Legal Proceedings?" the policy states:

> You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law.

(Doc. 1-1, p. 28). In other words, the policy contemplates a 60-day waiting period before filing suit *after a claim for benefits* has been submitted. But what about when a claim for benefits has been denied—or in Mr. Bowman's case, when a claim has been approved and subsequently terminated? The "Claims and Appeals" section of the policy states:

> If your claim for benefits is denied or if you do not receive a response to your claim within the appropriate time frame (in which case the claim for benefits is deemed to have been denied), you or your representative may appeal your denied claim in writing to Prudential within 180 days of the receipt of the written notice of denial or 180 days from the date such claim is deemed denied. You may submit with your appeal any written comments, documents, records and any other information relating to your claim.
> . . .
> Prudential shall make a determination on your claim appeal within 45 days of the receipt of your appeal request. This period may be extended by up to an additional 45 days if Prudential determines that special circumstances require an extension of time.

*Id.* at 36.

Importantly, the policy also contemplates a second level of appeal, which is repeatedly characterized as "voluntary." *See id.* at 37. The fact that the second level of appeal is voluntary certainly implies that the first level of appeal is mandatory; but this fact is not explicitly set forth in the policy. Regardless, it is clear that Mr. Bowman chose to appeal the termination of his benefits, and then, rather than wait the 45 days it would take

for that appeal to be completed, he filed a lawsuit in federal court. Once Prudential completed its review of his appeal, it found in Mr. Bowman's favor, reversed its decision to terminate his benefits, and reinstated his benefits in full—back-dated to the date they were originally terminated. The decision to reinstate his benefits occurred just before the Court's initial Case Management Hearing, and during that hearing, counsel for Mr. Bowman agreed that if Prudential paid all that it had committed to pay Mr. Bowman, no claim for denial of benefits under the policy would exist.

Mr. Bowman now refuses to concede that his contract claim is moot and clings to his argument that he would like to be reimbursed by Prudential for emotional damages and perhaps other damages that do not include the payment of benefits. The Court is reminded that during the Case Management Hearing, Mr. Mayton was asked how Mr. Bowman could maintain a breach of contract action against Prudential without an underlying claim for compensatory damages, and, further, how any of the facts set forth in the Complaint could possibly state a claim for bad faith. As Mr. Mayton's responses left the Court with more questions than answers, the Court determined at the conclusion of the hearing that the fairest way to proceed was to allow Mr. Bowman the opportunity to reconsider his Complaint over the next 30 days, and then file an amended complaint if he believed any of his claims were still viable.

In reviewing the proposed amended complaint that has now been filed, the Court is singularly unimpressed with the fact that it has not undergone any material change in the three months since the Case Management Hearing, except for the bare addition of certain facts underlying Prudential's decision to reinstate benefits. The proposed amended complaint states plainly that Mr. Bowman no longer has a claim for compensatory

13

damages. *See* Proposed Amended Complaint, Doc. 36-1, ¶ 68 ("Mr. Bowman's benefits were reinstated in early January 2017 retroactive to September 9, 2016, minus $12,800 overpayment, and have thus far been paid without incident."). Unfortunately, this fact does not dissuade him from pursuing his breach of contract action and claiming what he characterizes as "*compensatory* damages for his emotional and mental pain and suffering." *Id.* at ¶ 118 (emphasis added).

"Generally, in order to state a cause of action for breach of contract the complaint need only assert the existence of a valid and enforceable contract between the plaintiff and defendant, the obligation of defendant thereunder, a violation by the defendant, and damages resulting to plaintiff from the breach." *Perry v. Baptist Health*, 358 Ark. 238, 244 (2004). With respect to damages, those that are considered "compensatory" necessarily flow from the breach itself, and those considered "consequential" only flow indirectly from the breach. *Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 364 Ark. 168, 175 (2005). In Mr. Bowman's case, he asserts that he "suffered financial, emotional, and mental damages on multiple occasions over the course of Prudential's bad faith mishandling of his claim." (Doc. 39, p. 1). He gives specific examples of his damages as follows:

> a diminished credit score, a depreciation in his status and reputation within the community, the loss of trust and goodwill from those to whom he owed money but was unable to pay, exacerbation of his anxiety and depression that increased the risk of harm to his [sic] self, physically, mentally, and emotionally . . . [and] an increase of approximately fifty percent (50%) on his monthly mortgage payments [due to his failure to pay his mortgage once he stopped receiving disability payments].

*Id.* at 38-39.

There is no plausible argument to be made that *any* of these damages flow directly

14

from Prudential's termination of Mr. Bowman's benefits. These damages are obviously consequential, as they flow indirectly from Prudential's decision to terminate benefits. The Arkansas Supreme Court has held that "[i]n order to recover consequential damages in a breach of contract case, a plaintiff must prove more than the defendant's mere knowledge that a breach of contract will entail special damages to the plaintiff. It must also appear that the defendant at least tacitly agreed to assume responsibility." *Reynolds*, 364 Ark. at 176. Mr. Bowman acknowledges in his Reply that there was no express agreement between the parties that would have made Prudential liable for consequential damages stemming from a breach of contract. The only remaining argument available to Mr. Bowman is that Prudential tacitly agreed to be liable for consequential damages.

The problem with Mr. Bowman's position on this issue is that, on the one hand, he agrees that the so-called tacit agreement rule "is the accepted test for determining consequential damages in contract cases," (Doc. 39, p. 4); however, on the other hand, he thinks the tacit agreement rule is "not a fair and suitable test when considering a breach of an insurance policy contract like the LTD policy at issue in this case," *id.* Being bound by Arkansas law, Mr. Bowman realizes that he cannot prove tacit agreement by pointing to Prudential's "mere knowledge that a breach of contract will entail special damages." *Reynolds*, 364 Ark. at 176. Nevertheless, he argues that because Prudential was "on notice" that his disability claim was based on psychiatric issues, Prudential should have also known that terminating his benefits might have far-reaching effects, including worsening psychiatric issues, a resulting inability to work to make ends meet, and consequential financial difficulties. (Doc. 39, pp. 5-6). These arguments do not establish tacit agreement, as Mr. Bowman tacitly concedes through his failure to cite to any legal

15

precedent in support of his argument. See id. at 4-6. Accordingly, the Court finds that Mr. Bowman's breach of contract claim is moot, as all demands for compensatory damages have been paid, and he has set forth no facts to show a plausible claim for breach of contract that relies only on a demand for consequential damages.

As for Mr. Bowman's bad faith claim, there are no facts in the proposed amended complaint that would sufficiently give rise to that cause of action, and no amount of discovery or opportunities to replead would save it from dismissal. In *Unum Life Insurance Co. of America v. Edwards*, 362 Ark. 624 (2005), the Arkansas Supreme Court reversed a jury verdict that found an insurance company had committed bad faith in the way it treated its insured's claim for long-term disability. The Court explained that under Arkansas law, "[i]n order to state a claim for bad faith, one must allege that the defendant insurance company engaged in affirmative misconduct that was dishonest, malicious, or oppressive," or "'carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge.'" *Id.* at 627-28 (quoting *State Auto Prop. & Cas. Ins. Co. v. Swaim*, 338 Ark. 49, 56 (1999)). "Mere negligence or bad judgment is insufficient so long as the insurer is acting in good faith." *Swaim*, 338 Ark. at 56. Further, "[t]he tort of bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct." *Id.*

In the *Edwards* case, the Court found that the facts presented to the jury did not support a claim for bad faith because the plaintiff's central argument was that the "*the denial itself* was wrongful"—not that the insurance company engaged in any affirmative acts of bad faith. 362 Ark. at 630 (emphasis in original). The Court explained its decision as follows:

> Unum denied the claim after Dr. Cusher, one of Unum's consulting physicians, reviewed Edwards' medical records. Dr. Cusher testified that he could not accurately evaluate her case without more medical information. His review no doubt influenced the decision to deny Edwards' claim, but Unum's reliance on his findings cannot reasonably be construed as affirmative bad-faith conduct.

Id.

Similarly, in the case at bar, Mr. Bowman's bad faith claim is rooted in his dissatisfaction with how Prudential handled its request for more medical information to substantiate Mr. Bowman's claim for disability benefits—a request that Prudential was entitled to make under the policy's terms. He complains that Prudential put him on notice that it might terminate his benefits, depending on the results of the medical review, and that Prudential kept extending or changing the date that benefits might end, which caused Mr. Bowman stress. These actions, if assumed true, do not rise to the level of bad faith. With respect to Dr. Hayes' recommendation to terminate benefits, Mr. Bowman agrees that Dr. Hayes evaluated the paper file as it existed at the time, and determined that Mr. Bowman's psychiatric condition had normalized, that his medication levels had decreased over time, that he was now able to work, and that he could return to his former job. Mr. Bowman's doctors had provided Prudential with their patient notes from Mr. Bowman's previous few visits, as well as one-sentence affirmations that his condition had not changed since the previous year, when benefits were first awarded. Although Mr. Bowman characterizes Dr. Hayes' medical opinion as "dishonest," "oppressive," "not provided ethically," and "not accurate to a reasonable degree of medical certainty," the fact is that Mr. Bowman simply disagreed with it, and during the administrative appellate process, he was given the opportunity to provide a more fulsome evaluation of his current medical state—which he did to positive effect—and his benefits were reinstated. Again, none of Prudential's actions

17

in relying on Dr. Hayes' opinion could possibly be characterized as being motivated by hatred, ill will, or a spirit of revenge.

In contrast to the facts presented here, the Arkansas Supreme Court has found a plausible claim of bad faith where, for example, "an insurance agent lied by stating there was no insurance coverage; aggressive, abusive, and coercive conduct by a claims representative, which included conversion of the insured's wrecked car; and where a carrier intentionally altered insurance records to avoid a bad risk." *Swaim*, 338 Ark. at 58. The above examples of bad faith behavior are instructive, as they serve as a foil to Mr. Bowman's allegations. The Court finds that the facts alleged in either the original Complaint or the proposed amended complaint fail to approach the severity needed to satisfy the Arkansas Supreme Court's standard for bad faith, and no amount of amending the Complaint will cure these deficiencies.

## IV. CONCLUSION

For all of these reasons, **IT IS ORDERED** that Plaintiff Curtis Bowman's Motion for Leave to Amend Original Complaint (Doc. 36) is **DENIED**, as the claims asserted therein are futile and would not survive a motion to dismiss. Further, as the proposed amended complaint contains at least the same facts, claims, and causes of action as the original Complaint, the Court finds, *sua sponte*, that the original Complaint (Doc. 1) asserts claims that do not survive Rule 12(b)(6) scrutiny. No amount of amendment can save these claims, and the case is therefore **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 30th day of May, 2017.

/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

18